**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RONALD HASKINS                              *

Plaintiff                                   *

v.                                          *            Civil Action No. JKB-15-664

WARDEN RICHARD J. GRAHAM, JR., et al. *

Defendants                                  *
                                          ***

**MEMORANDUM**

By memorandum and order dated November 12, 2015, this court required medical defendants to supplement their motion to dismiss or for summary judgment addressing the delay in providing plaintiff with spinal surgery, which was at one time approved and scheduled. ECF 49 and 50. Defendants' supplemental motion for summary judgment (ECF 56) is now pending and plaintiff has opposed the motion (ECF 57). Defendants filed a reply (ECF 59) and in correspondence to this court plaintiff seeks injunctive relief as well as appointment of counsel (ECF 58, 60, and 61).

**Background**

The following facts were noted by this court in its memorandum opinion:

In his initial complaint, plaintiff claimed he was transferred to Western Correctional Institution ("WCI") for retaliatory reasons and was denied the use of a medically prescribed wheelchair and four-prong cane. ECF 1 and 3. He alleged that denial of the medical assistive devices denied him the opportunity to dine in the prison chow hall, access showers, and to attend medical sick call. ECF 3. The response to show cause filed by counsel for the Department of Public Safety and Correctional Services established that plaintiff was provided a wheelchair for long distances and a wheelchair pusher, as well as a leg brace, a four prong cane, and assignment to bottom-bunk and bottom-tier housing. ECF 12 at Ex. 2. Additionally, it was established that plaintiff was transferred from Jessup Correctional Institution to WCI because he assaulted another inmate which resulted in an infraction for which plaintiff was found guilty as well as an enemy situation which necessitated plaintiff's transfer. *Id*. at Ex. 1,

p. 1.  Based on this evidence, this court found that the relief sought by plaintiff in his motion for preliminary injunction was already provided and that his claim for retaliation was without merit. The issue left to resolve is whether defendants subjected plaintiff to cruel and unusual punishment in violation of his Eighth Amendment right through depriving him of surgery, medical supplies for incontinence, and pain medication.

Plaintiff alleges he suffers constant pain and is in fear for his life.  ECF 5 at p. 1.  He further alleges he was approved for surgery, but it was not performed because he ate something [prior to surgery].  ECF 22 at p. 1.  He claims the surgery was then cancelled and he was told that an updated MRI would be required to determine what would be done for him now.  He further states he planned to refuse any outside medical trips until he hears from this court and that he was moved to segregation housing.  *Id.* at pp. 1-2.  Plaintiff further claimed he was "living in foul conditions" as he was not being given supplies for his urinary and fecal incontinence.  *Id.* at p. 2.  Specifically, he claimed he was not being given waste bags and the cell window was deliberately welded shut.  *Id.*  Plaintiff provides a detailed log of his encounters with correctional and medical staff and asserts it establishes both retaliation and deliberate indifference to his serious medical needs.

Defendants provide medical records[1] as well as the affidavit of Dr. Colin Ottey in support of their motion to dismiss or for summary judgment.  ECF 31.  In addition to the evidence previously provided by Dr. Ottey in his affidavit in support of the response to show cause, he states that plaintiff is seen regularly in the chronic care clinic for pain management and neurology evaluation among other issues.  ECF 31 at Ex. 2, p. 2.  On May 21, 2015, plaintiff was seen by Beverly McLaughlin, RNP, who noted that plaintiff had received x-rays and was waiting to receive a CT scan as well as a possible anterior cervical discectomy and fusion.  *Id.*  Plaintiff's diagnoses include cervicalgia (neck pain), cervical spondylosis with lower left-sided weakness and upper extremity weakness, chronic pain syndrome, and cerebrovascular disease.  *Id.*  McLaughlin put in a request for a prescription for Gabapentin to treat plaintiff's pain.  *Id.*  The same day, plaintiff was approved for a CT scan to be performed at University of Maryland Medical System ("UMMS").  *Id.*  On May 27, 2015, plaintiff's x-rays were read and determined to show moderate degenerative joint disease at C5-C6 and C-6 and C-7 levels.  *Id.*

On May 31, 2015, plaintiff was seen by Paula Connors, RN in response to his requests for a wheelchair, medication, and supplies.  Connors referred plaintiff for renewal of supplies and he was seen on June 11, 2015 by McLaughlin.  *Id.* at pp. 2 – 3.  McLaughlin renewed plaintiff's prescription for Gabapentin,[2] but

---

[1]    Defendants' motion to seal (ECF 32) shall be granted.

[2]    Gabapentin or Neurontin is an anti-epileptic medication that affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.  *See http://www.drugs.com/gabapentin.html.*

referred his complaints regarding a wheelchair to the Regional Medical Director. *Id*. at p. 3. Plaintiff also complained of pain in his right hand and McLaughlin noted the hand showed weakness and numbness in the first three fingers. *Id*. Additionally, plaintiff's left foot could not fully extend and exhibited weakness. *Id*.

On June 25, 2015, plaintiff refused to go to UMMS for the CT scan scheduled, based on his assertion that he was not seen by a doctor at WCI. *Id*. Although McLaughlin reminded plaintiff several times he had been seen by her and a nurse practitioner several times and reassured him they were doing all they could to help him, plaintiff continued to refuse. *Id*. Plaintiff voiced his disdain over the fact that he had been given a single cell for six years prior to his transfer to WCI. As a result of the stalemate, McLaughlin indicated she would refer plaintiff to the Regional Medical Director for further evaluation. *Id*.

Dr. Robustiano Barrera saw plaintiff on June 30, 2015, and ordered three briefs and three hazard bags per week for plaintiff's incontinence. On July 15, 2015, plaintiff saw Connors in response to his complaints about pain in his right hand, wheelchair issues, and his request for more waste bags. *Id*. at p. 4. During this encounter with Connors, plaintiff explained that he needed more red waste bags to place soiled briefs or he would be forced to continue flushing them down the toilet. Connors called the infirmary about providing more waste bags and was informed they could only provide what had been approved. When Connors called her superior regarding the matter, she was advised that plaintiff could not have any additional bags and that he should be instructed to dispose of his briefs in the proper area on his tier. *Id*. When plaintiff received his supplies five days later, he voiced no further complaints. *Id*.

With regard to the pain in plaintiff's right hand, he told Connors that the pain was caused by poor positioning when transferring himself from his bed to his wheelchair and vice versa. Connors provided plaintiff with a warm compress and advised him to avoid putting weight on it or lifting anything heavy. Connors also referred plaintiff to a provider for further evaluation of the pain. *Id*.

On July 27, 2015, plaintiff was seen by Dr. Ottey for a scheduled visit. Plaintiff asked Dr. Ottey to renew his special needs orders and it was noted that plaintiff continued to use a wheelchair for long distances and a quad cane otherwise. *Id*. at p. 5. Although plaintiff complained of pain in his right hand, Dr. Ottey noted that he carried his cane in his right hand. Dr. Ottey also states that plaintiff did not bring his cane to the visit, making it impossible for plaintiff's gait to be tested. At this appointment Dr. Ottey renewed orders for a quad cane and wheelchair for long distances for one year. No changes were made to the medications prescribed to plaintiff. *Id*.

Dr. Ottey states that notwithstanding a few missed doses in February of 2015, plaintiff has regularly received his prescription medication as ordered. He further avers that defendant Janice Gilmore never cancelled the order for plaintiff's wheelchair and that the weekly supplies of briefs and waste bags are appropriate for his condition. *Id.* The pending motion to dismiss or for summary judgment does not address plaintiff's need for surgery, nor does it explain why the surgical option has been abandoned.

On June 3, 2011, plaintiff was given an MRI which revealed bulging discs with osteophytes at levels C3 – C4, C4 – C5, C5- C6, and C6- C7; pressure on the spinal cord at C4 – C5 and C5 – C6; and central canal stenosis at C5- C6. ECF 15-1 at p. 12. It was further noted that the spinal cord appeared normal, but that the stenosis appeared somewhat greater as compared to earlier images. *Id.* The following year, an EMG performed on June 7, 2012, revealed multi-level cervical disk disease with acute radiculopathy around C5 which was noted to be more prominent on the right. *Id.* at p. 10. That evaluation further noted that physical therapy had brought no relief of symptoms and that plaintiff still has severe neck pain with burning sensations in his right hand despite taking Neurontin [Gabapentin]. *Id.* Neurosurgery evaluation for possible surgery was recommended. *Id.*

Plaintiff was evidently approved for the surgery as indicated in a December 15, 2014 response to an administrative remedy procedure complaint stating that plaintiff's "last surgery" was cancelled because he ate prior to the appointment against the advice of medical staff. ECF 15-1 at p. 17. On May 21, 2015, records indicate that plaintiff has a history of cervicalgia and cervical spondylosis and that he was waiting for a CT scan for purposes of a possible ACDF or anterior cervical discectomy with fusion.[3] ECF 32-2 at p. 1. On June 11, 2015, it is again noted that surgery for cervical stenosis was pending. *Id.* at p. 10. While the records also establish that plaintiff has contributed to the delay by refusing to go to UMMS for the required CT scan (*see id.* at p. 15), there is nothing indicated in the record that efforts are underway to reschedule plaintiff for required pre-operative testing and for the needed surgery. Notwithstanding the absence of any mention of a plan to provide surgery to plaintiff, he is described in a record dated June 30, 2015 as "paraplegic incontinent of urine and stools with cervical spinal cord injury." *Id.* at p. 16.

ECF 49 at pp. 1-6.

---

[3]       Anterior cervical discectomy and fusion (ACDF) is a surgery to remove a herniated or degenerative disc in the neck area of the spine. The incision is made in the front of the spine through the throat area. After the disc is removed, a bone graft is inserted to fuse together the bones above and below the disc space. *See* *http://www.mayfieldclinic.com/PE-ACDF.htm.*

In their supplemental motion for summary judgment, the medical defendants assert that plaintiff is not paraplegic and is able to walk short distances while holding onto something.  ECF 56 at Ex. 2.  On November 19, 2015, plaintiff was evaluated for his ability to walk by Dr. Barrera.  *Id*. at Ex. 1, p. 7.  Barrera claims he mistakenly noted that plaintiff was paraplegic without evaluating his ability to walk and based the notation on his assumption plaintiff was paraplegic because he was in a wheelchair.  *Id*.  Barrera further notes that plaintiff has "left sided paresis with mild spasticity" and that plaintiff "will need the wheelchair for long distance only, since he can ambulate sufficiently in his cell."  *Id*.

On November 21, 2015, Barrera notes that plaintiff refused a cervical CT scan and describes plaintiff's condition as "unstable cervical spine showing mal-alignment on flexion and extension CS views."  ECF 56 at Ex. 2, p. 9.  Barrera notes he explained to plaintiff the importance of having the CT scan in order to decide if he will need surgery and that plaintiff agreed to have the scan done "this time."  *Id*.

On December 3, 2015, plaintiff reported to Dennis Martin, RN, that he wanted to stop all medication except Neurontin.  ECF 56 at Ex. 2, p. 12.  Martin notes that plaintiff continues to experience neck discomfort, but that plaintiff stated he was due to have surgery.  *Id*.  Martin further notes that plaintiff refused a CT scan on November 21, 2015.  *Id*.

On December 4, 2015, plaintiff was called again for a medical trip to obtain a CT scan.  ECF 56 at Ex. 2, p. 14.  Plaintiff refused and stated, "I want to wait until I hear from the courts."  *Id*.  Plaintiff also refused to discuss the issue with the doctor and wrote on the release of responsibility form that he "will receive health care once I hear from the courts (Judge Bredar)."  *Id*.

Plaintiff admits that he did in fact refuse to have the CT scans and claims it is due to his lack of trust in the medical care contractor, Wexford Health Sources. ECF 57 at p. 6.  He asserts he had imaging scans in 2012 that indicated he required surgery, but after he filed suit against Janice Gilmore and Dr. Ava Joubert, he was transferred to Maryland Correctional Training Center (MCTC).  *Id*. at p. 1.   While he was at MCTC, plaintiff states his need for surgery was confirmed by Dr. Nimely, who ordered more tests, which again indicated he needed surgery.  *Id*. at pp. 1-2.  Plaintiff's surgery that was scheduled in 2013 was postponed because he was transferred to Jessup Correctional Institution (JCI).  *Id*. at p. 2.

Upon arriving at JCI, plaintiff claims the doctors there told him he would have to take all the diagnostic tests again before he would be allowed to receive the surgery.  ECF 57 at p. 2. Despite that alleged statement, plaintiff states that "out of the blue" he was called for surgery, but it had to be postponed because he had eaten food.  *Id*.  He alleges these events occurred in 2014 and states that, in answer to an administrative remedy complaint dated December 15, 2014, concerning the cancelled surgery, Warden Wolf stated in part that the surgery had been rescheduled.  *Id*.

On January 29, 2015, plaintiff states he was transferred to Western Correctional Institution (WCI) after having received additional CT scans for the planned surgery referenced by Wolf.  *Id*.  His transfer to WCI also brought with it the confiscation of his cane, wheelchair, medication, housing in a handicapped accessible cell, and the surgery.  *Id*.  Plaintiff notes that after filing the instant lawsuit, his medical devices, medication, and housing assignment were given back to him.  *Id*.

Thus, plaintiff claims that each time the surgery date got closer he was transferred to another prison, interrupting the process of getting the surgery done.  He claims these transfers

were done as a deliberate means to deny or hinder his ability to receive the surgery.  ECF 57 at pp. 2 -3.

Plaintiff further states that he was denied medical care because he did not have a wheelchair on March 20 and 21, 2015, and April 6, 9, and 13, 2015.  ECF 67 at p. 8.  On April 13, 2015, he was scheduled for an outside medical trip which had to be rescheduled due to the fact he was not given a wheelchair; two days later he was seen.  *Id.*

In correspondence to this court, plaintiff seeks another transfer to an institution where Wexford Health Sources is not the medical care provider under contract.[4]  ECF 60.  Plaintiff does not deny the assertion that he has asked to be removed from pain medication and appears to take the position that surgery, not pain medication, is the only acceptable treatment for his condition.  *See* ECF 61 (indicating pain medication causes other problems and surgery is needed).

### Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

---

[4]       Wexford Health Sources is the medical care provider contracted for all prisons within the Maryland Department of Public Safety and Correctional Services.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)).  The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511

U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

As noted by this court previously, plaintiff suffers an objectively serious medical condition that impacts on the quality of his life and is the source of chronic pain. The record evidence establishes that medical care providers have recognized the seriousness of plaintiff's condition and have attempted to treat it. While plaintiff maintains that the transfers between prisons that delayed and ultimately denied his opportunity to receive surgery that has been approved on at least two occasions was retaliatory, he offers no evidence that the named

defendants, or any other medical care provider, facilitated or ordered those transfers. Defendants correctly state that they are not liable for delays caused by plaintiff's refusal to cooperate with care, including CT scans scheduled to determine how or if surgery is needed. They maintain that plaintiff is being encouraged to cooperate with his plan of care, but also assert that his condition can be conservatively managed and that his condition is stable. The assertion that plaintiff's condition is stable is contradicted by notations in the medical records submitted with defendants' supplemental motion, which they have affirmed are true and accurate. While plaintiff is not entitled to the care of his choice and defendants may not be held liable for failing to provide that care he might prefer, medical care that has been acknowledged as required to treat a serious condition may not be withheld simply because a prisoner has failed to cooperate with diagnostic testing. To the extent plaintiff has inconvenienced defendants through his refusals, that inconvenience is not a legitimate reason to now surmise that the surgery, which has been previously approved, is no longer necessary.

Plaintiff is not without fault in the recent delays that have occurred. His admitted refusal to attend pre-surgical testing based on his plan to wait to hear from this court was a poorly considered decision. This court is not a medical care provider and while plaintiff's frustration with the bureaucracy encountered in his four-year long effort to obtain surgery is understandable, he cannot point to that same bureaucracy as the cause of his suffering when he has refused to submit to testing. The pre-surgical requirements that plaintiff has been forced to endure are not caused by his incarceration; the general public must also submit to requests made by their physicians before treatment of this magnitude is approved.

Notwithstanding those observations, defendants are forewarned that further delays in rescheduling plaintiff for surgical approval lends credence to plaintiff's assertions that the

surgery is denied for purposes other than acceptable medical practices. While this court is reluctant to require defendants to engage in a futility and a waste of resources by once again offering services to plaintiff that he intends to refuse, requiring nothing further in this case is also not an attractive option.

Defendants' supplemental motion for summary judgment will be held in abeyance pending submission by counsel and plaintiff of status reports. Plaintiff's status report must specify under oath his intent with regard to his cooperation with further pre-surgical testing and any other medical appointments and prescribed care provided to him by Wexford Health Sources employees. Plaintiff's request for a transfer is denied as the relief sought is unavailable; there is no prison in the State of Maryland that does not utilize Wexford as the medical care contractor. Plaintiff is forewarned that any actions on his part that conflict in any way with his stated intentions will result in the dismissal of this complaint and no further consideration of the matters raised herein. Counsel shall submit a status report within 21 days of plaintiff's status report and shall address by declaration under oath any revisions to plaintiff's planned care in light of his stated intent regarding cooperation with offered care. Following consideration of the status reports of the parties, the court will issue an order regarding defendants' supplemental motion for summary judgment.

A separate order follows.

February 26, 2016
Date

_____/s/_____
James K. Bredar
United States District Judge

11